**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ALASKA DEPARTMENT OF
HEALTH AND SOCIAL SERVICES,
                    *Petitioner,*

v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES, MARK B.
MCCLELLAN IN HIS OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE
CENTERS FOR MEDICARE AND
MEDICAID SERVICES; MICHAEL O.
LEAVITT,* Secretary,
                    *Respondents.*

No. 04-74204
HHS No.
CMS 2003-14
OPINION

On Petition for Review of an Order of the
Department of Health and Human Services

Argued and Submitted
July 12, 2005—Anchorage, Alaska

Filed September 12, 2005

Before: Alfred T. Goodwin, Melvin Brunetti, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Brunetti

---

*Michael O. Leavitt is substituted for his predecessor, Tommy G. Thompson, as Secretary of Health and Human Services of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**COUNSEL**

Charles A. Miller, Covington & Burling, Washington, DC, for the petitioner.

Gerard Keating, Office of the General Counsel, United States Department of Health and Human Services, Washington, DC, for the respondents.

**OPINION**

BRUNETTI, Circuit Judge:

The Alaska Department of Health and Social Services (hereinafter the "State") petitions for review of a final determination by the Administrator of the Centers for Medicare and Medicaid Services ("CMS" or "Agency") disapproving a proposed Medicaid state plan amendment that would alter the rate at which the federal government reimburses State expenditures on behalf of patients at Indian tribal health facilities. The Administrator rejected the proposed amendment on two alternative grounds: (1) that it was inconsistent with the statutory requirement of efficiency, economy, and quality of care; and (2) that it failed to comply with a regulation governing payment ceilings. The State challenges the Administrator's decision as arbitrary and capricious under the Administrative Procedure Act. We conclude that the Administrator's interpretations of the statute and regulation were permissible and deny the petition for review.

## I.  BACKGROUND

### A.  *Statutory Framework*

Medicaid is a cooperative federal-state program through which the federal government reimburses states for certain medical expenses incurred on behalf of needy persons. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). Participation by states is voluntary, but those that choose to participate must comply both with statutory requirements imposed by the Medicaid Act and with regulations promulgated by the Secretary of Health and Human Services. *Id.*; *see also Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1493 (9th Cir. 1997).

To qualify for federal assistance, participating states must submit to the Secretary, and have approved, a "plan for medical assistance" that describes the nature and scope of the state program. *Wilder*, 496 U.S. at 502. The Medicaid Act prescribes a laundry list of requirements that this state plan "must" satisfy, 42 U.S.C. § 1396a(a), and an extensive body of regulations implements these requirements. The Secretary "shall approve" any state plan (or amendment) that fulfills these statutory and regulatory conditions, 42 U.S.C. § 1396a(b), and has delegated this authority to the CMS Administrator. 42 C.F.R. § 430.15(b).

Under normal circumstances, if the Administrator approves the state plan, the federal government reimburses the state for a fixed percentage of certain expenses that the state incurs on behalf of Medicaid-eligible individuals. This percentage, known as the Federal Medical Assistance Percentage ("FMAP"), varies from state to state. Health care providers bill the state, the state pays the providers, and the federal government reimburses the state at the FMAP rate—which, for Alaska in 2004, was 57.58%. The state is responsible for the balance. In theory, this arrangement incentivizes states to keep rates at efficient levels, because they share financial responsibility for Medicaid costs with the federal government.

66 Fed. Reg. 3148, 3175 (2001). The tribal facilities at issue in this case are unique, however, and by statute receive 100% FMAP. *See* 42 U.S.C. § 1396d(b).[1] There are seven such facilities—one in Anchorage and six in rural areas.

Assuming that its plan meets federal requirements, a state has considerable discretion in administering its Medicaid program, including setting reimbursement rates. *See Lewis v. Hegstrom*, 767 F.2d 1371, 1373 (9th Cir. 1985). The statutory requirement at issue here provides that a state plan must

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care[.]

42 U.S.C. § 1396a(a)(30)(A) [hereinafter "§ 30(A)"]. Neither the Medicaid Act, nor its implementing regulations, define the terms "efficiency," "economy," or "quality of care." However, since 1997, § 30(A) has been the principal statutory authority for a series of upper payment limit ("UPL") regulations that cap state reimbursement rates to "promote economy and efficiency." 66 Fed. Reg. at 3148. These regulations have

---

[1]Historically, Indian Health Service ("IHS") facilities were funded directly and entirely by the federal government and did not participate in Medicaid reimbursement. To improve services, Congress in 1976 amended the Medicaid Act to permit reimbursement of state expenditures on behalf of eligible Native Americans at IHS facilities. Pub. L. No. 94-437, 90 Stat. 1400 (1976). But, because services at these facilities previously were funded wholly by the federal government, this amendment provided for 100% FMAP so that no additional burden would fall on the states. In 1996, the Agency broadened its definition of "Indian Health Service facilities" to include not only IHS facilities (which are federally owned and operated) but also tribal facilities (which are owned and operated by tribes but receive funding from the IHS).

been modified several times in recent years to respond to concerns about states' inappropriate use of intergovernmental transfers to fund their Medicaid programs.

## B. Regulatory Framework

An intergovernmental transfer ("IGT") is a mechanism by which states use local, rather than state, dollars to fund the state share of Medicare expenditures. Such transfers—which typically require that public entities at the city or county level transfer funds to the state—are specifically sanctioned by the Medicare Act, which grants states the flexibility to fund up to 60% of their share of Medicare expenditures with local dollars. 66 Fed. Reg. at 3148. Although the Agency recognizes that the use of IGTs is protected by statute, in its view "that flexibility has been used in recent years to establish funding arrangements that are excessive and abusive and do not assure that federal Medicaid funding is spent for Medicaid covered services provided to Medicaid eligible individuals." *Id.* at 3164.

In 2001, audits by the Office of the Inspector General and the General Accounting Office revealed a relationship between IGT misuse and excessive federal Medicaid spending. The Agency, concluding that its UPL regulations created a financial incentive for IGT abuse, modified them by rule. *Id.* at 3148. In short, the then-existing UPLs placed a single upper limit on aggregate payments made to several categories of providers, including (i) state government-owned facilities, (ii) non-state (i.e., city and county) government-owned facilities, and (iii) private facilities. 65 Fed. Reg. 60151, 60151-52 (2000). This allowed states to set reimbursement rates for city and county facilities at relatively high levels, and other facilities at relatively low levels, while still complying with the overall aggregate UPL. 66 Fed. Reg. at 3149-50. Because the federal government reimburses states for a fixed percentage of their Medicaid expenses, the higher rates at local facilities led to higher federal matching payments. *Id.* at 3150. And, as

these local facilities are public entities, the majority of excess federal matching payments could be returned, via IGTs, from local providers to the states. The states ultimately used the excess federal dollars to fund their own share of Medicaid expenses—and sometimes for wholly unrelated purposes. *Id.*

The Agency determined that this practice, which effectively replaced state Medicaid dollars with federal Medicaid dollars, was "not consistent with the statutory requirements that Medicaid payments be economical and efficient." *Id.* To remedy this problem, and to reduce the incentive for abuse, the Agency revised the UPL regulations. Specifically, it retained the upper limit on overall aggregate payments to all facilities, and implemented separate aggregate limits for both state government-owned facilities and non-state government-owned facilities. *Id.*; 42 C.F.R. § 447.272; 42 C.F.R. § 447.321.

However, "Indian Health Services facilities and tribal facilities" were specifically excepted from the scope of these new regulations. Instead, these facilities were made subject to a separate UPL for "other" facilities, which provides:

> The [state] agency may pay the customary charges of the provider but must not pay more than the prevailing charges in the locality for comparable services under comparable circumstances.

42 C.F.R. § 447.325; *see* 66 Fed. Reg. at 3159. In proposing this exception, the Agency explained that "we excluded IHS facilities because we believe there is little incentive for States to pay enhanced rates to these facilities. Rates to these facilities are generally set by the State in accordance with rates published by the Federal government." 65 Fed. Reg. at 60153. Its concern, rather, was that categorizing them as "public facilities within the UPLs may enable States to set lower payments for the IHS and tribal facilities, and set payments for government operated providers at higher levels and still com-

ply with the aggregate UPLs." 66 Fed. Reg. at 3159. There-fore, "to avoid these types of incentives, [the Agency] excluded IHS facilities from the UPLs." *Id.*

## C. The State Plan Amendment

Shortly after the 2001 amendments to the UPLs, Alaska submitted state plan amendment 01-009 to the Agency. It pro-vided:

> Under agreement with a Tribal Health Facility pro-vider the [Alaska] Department [of Health and Social Services] may pay the customary charges of the pro-vider but must not pay more than the prevailing charges in the locality for comparable services under comparable circumstances. Such a payment . . . is subject to the payment limits at 42 CFR 447.325.

The text of the proposed amendment thus tracks verbatim the UPL that the 2001 amendments made applicable to the tribal facilities at issue. In response to the Agency's request for clar-ification, the State explained that, to receive the additional federal revenue generated by the amendment, the tribal facili-ties "will be expected" to enter into an IGT with the State, under which the facilities would retain just 10% of the addi-tional federal monies. Finally, the State indicated that, should the proposed amendment take effect, additional federal pay-ments would amount to nearly $50 million a year.

The Agency disapproved the proposed amendment as inconsistent with § 30(A), primarily because the "proposed rates would substantially exceed the IHS published rates" on which federal payments have historically been based. It fur-ther explained that the IHS rates are "based on an analysis of statewide costs of the Alaska IHS facilities" and that, while it "might consider a request for a higher rate if supported by data showing costs that were not considered by IHS in setting the published rates, Alaska provided no such data to substanti-

ate its proposed rates." The Agency concluded that, absent such data, the proposed rates "are not consistent with efficiency, economy, and quality of care" under § 30(A).

The State petitioned for reconsideration and, after briefing and a formal hearing, the hearing officer recommended that the disapproval of the proposed amendment be affirmed because it was not consistent with either § 30(A) or 42 C.F.R. § 447.325. The Administrator agreed and, in a reasoned opinion, affirmed disapproval of the amendment. *In re The Disapproval of the Alaska State Plan Amendment No. 01-009*, No. 2003-14 (CMS Administrator June 22, 2004).

## II.   STANDARD OF REVIEW

Under the Administrative Procedure Act, we may set aside formal agency action only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Wilderness Soc'y v. United States Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc), *amended by* 360 F.3d 1374 (9th Cir. 2004). Factual findings are reviewed for substantial evidence. *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1076-77 & n.8 (9th Cir. 2003).

> [A]n agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## III.   DISCUSSION

The Administrator rejected the proposed amendment on two alternative grounds: (1) that it was inconsistent with the

statutory requirement of efficiency, economy, and quality of care under § 30(A); and (2) that it failed to comply with the UPL set forth in 42 C.F.R. § 447.325. Examining each ground in turn, we conclude that either is independently adequate to support disapproval.

## A.    Section 30(A)

In concluding that the amendment was inconsistent with § 30(A), the Administrator first determined that the UPL regulations promulgated pursuant to that section are not that section's sole requirement; rather, the statute requires that rates be consistent with efficiency and economy notwithstanding compliance with the UPL regulations. She found that the State failed to meet the statutory standard because it submitted no data—let alone an assertion—that the current IHS rates were inadequate. Moreover, she viewed the State's insistence that tribal facilities return to the State 90% of the increased federal payments, via IGTs, as an "implicit acknowledgment" that the current IHS rates are sufficient.

The State argues that § 30(A) cannot be an independent basis for disapproval of an amendment that complies with UPL regulations promulgated pursuant to that section. Instead, it urges that compliance with UPL regulations conclusively establishes that rates meet the statutory mandate of efficiency and economy.[2] It argues that there is no basis whatsoever for cost-based review of state rate setting, and therefore that case-by-case review of rates is an encroachment on state discretion. Accordingly, it suggests that it was inappropriate for the Administrator to request cost data justifying the rate increase. Finally, it emphasizes that IGTs are protected by statute and fit within current regulations.

---

[2]As discussed in Part B, *infra*, the Agency disagrees, as do we, that the State has complied with the UPL regulation at 42 C.F.R. § 447.325. For the purposes of the discussion in Part A, however, we accept *arguendo* that it has so complied.

*1.* Chevron *Deference*

The parties initially disagree about the degree of deference owed to the Administrator's interpretation of the statutory text —namely, the terms "efficiency" and "economy." Although we generally afford *Chevron* deference to the Agency's interpretations of the Medicaid Act, *see, e.g.*, *Folden v. Wash. State Dep't of Social & Health Servs.*, 981 F.2d 1054, 1058 (9th Cir. 1992), the State contends that *Skidmore* deference is instead appropriate because the Agency's interpretation is contrary to existing regulations and "does not . . . bespeak the legislative type of activity that would naturally bind more than the parties to the ruling." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). *Compare Chevron U.S.A. Inc. v. Nat. Res. Defense Council Inc.*, 467 U.S. 837, 842-45 (1984), *with Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944).

**[1]** We disagree. *Chevron* deference is required "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law." *Mead*, 533 U.S. at 226-27. *Mead* recognized that "Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force," and noted that the "fruits of notice-and-comment rulemaking or formal adjudication" receive *Chevron* deference. *Id.* at 230; *see also INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (giving *Chevron* deference to the BIA's construction, through case-by-case adjudication, of ambiguous statutory terms). Here, the formal administrative process afforded the State included the opportunities to petition for reconsideration, brief its arguments, be heard at a formal hearing, receive reasoned decisions at multiple levels of review, and submit exceptions to those decisions. These hallmarks of "fairness and deliberation" are clear evidence that Congress intended the Administrator's final determination to "carry[ ] the force of law." *Mead*, 533 U.S. at

226-27; *see Pharm. Rsch. Mfrs. of Am. v. Thompson*, 362 F.3d 817, 821-22 (D.C. Cir. 2004) (holding that the Secretary's duty to "ensur[e] that each state plan complies with a vast network of specific statutory requirements" constitutes an "express delegation of specific interpretative authority" that evidences Congress's intent to imbue the "Secretary's determinations [with] the force of law"); *see also Texas v. United States Dep't of Health & Human Servs.*, 61 F.3d 438 (5th Cir. 1995) (applying *Chevron* deference in the context of the disapproval of a Medicaid state plan amendment); *Georgia v. Shalala*, 8 F.3d 1565 (11th Cir. 1993) (same).

**[2]** Accordingly, to the extent that the State challenges the Administrator's interpretation of ambiguities in § 30(A), we apply the familiar *Chevron* framework. Under *Chevron*, " '[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' " *Wilderness Soc'y*, 353 F.3d at 1059 (quoting *Chevron*, 467 U.S. at 842-43). But, if the statute is silent or ambiguous with respect to the issue at hand, then the reviewing court must defer to the agency so long as " 'the agency's answer is based on a permissible construction of the statute.' " *Id.* (quoting *Chevron*, 467 U.S. at 843).

### 2. Construction of § 30(A)

**[3]** Before reaching the propriety of the Administrator's interpretation of § 30(A), we first conclude that she permissibly relied on that section as an independent basis for disapproval of the proposed amendment, notwithstanding its compliance with the applicable UPL. The statutory text makes clear that the Secretary has the authority—indeed, the obligation—to ensure that each of the statutory prerequisites is satisfied before approving a Medicaid state plan amendment. 42 U.S.C. § 1396a(b) provides: "The Secretary shall approve any plan which fulfills the conditions specified in subsection (a) . . . ." One such condition is: "A State plan for

medical assistance must" "provide such methods and procedures . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). Because the Secretary is charged with ensuring that the State complies with this statutory mandate, it follows that he cannot approve a state plan that does not provide such methods and procedures—even if it complies with other regulations.

[4] Contrary to the State's argument that the UPL regulations leave "no gap to fill," and thus that there is no role here for *Chevron* deference, it is, in fact, possible to violate the broad statute while complying with the UPL regulations. Although the UPL regulations are clearly grounded in economic concerns, in that they proscribe payment levels that exceed certain limits, the terms "efficiency" and "economy" are nowhere defined in the Medicaid Act or its implementing regulations. Thus, we cannot equate mere compliance with the UPL regulations as conclusive proof of compliance with the broader statutory requirement.

In her decision, the Administrator concluded that the proposed amendment—which, by all accounts, would at least double payments to the facilities at issue, while the facilities would retain only 10% of the additional payments—is not consistent with efficiency and economy. The authority to elucidate the meaning of the statute in this manner, via case-by-case adjudication, is well within the Secretary's mandate. *See Pharm. Rsch.*, 362 F.3d at 821-22; *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995) ("[There is no] basis for suggesting that the Secretary has a statutory duty to promulgate regulations that . . . address every conceivable question in the process of determining equitable reimbursement.").

[5] Thus, the undefined terms "efficiency" and "economy" leave a gap that the Administrator permissibly filled via case-by-case adjudication. We have no doubt that her interpretation is "based on a permissible construction of the statute." *Wil-*

*derness Soc'y*, 353 F.3d at 1059 (internal quotation omitted); *see also Penn. Pharm. Ass'n v. Houston*, 283 F.3d 531, 537 (3rd Cir. 2002) (en banc) ("What sort of payments would make a program inefficient and uneconomical? Payments that are *too high*."). Therefore, we must defer to it.

### 3. Statutory Context

**[6]** The Administrator's interpretation of § 30(A) is also consistent with the broader statutory scheme. *See Wilderness Soc'y*, 353 F.3d at 1060-61 (noting that the court, in discerning congressional intent, may also look to the overall purpose and structure of the statutory scheme). Specifically, we find no merit in the State's claim that there is no basis for cost-based review of state ratesetting. To the contrary, our precedent plainly requires a state to set reimbursement rates "that bear a reasonable relationship to efficient and economical hospitals' costs of providing quality services, unless the [state] shows some justification for rates that substantially deviate from such costs." *Orthopaedic Hosp.*, 103 F.3d at 1496. Thus, we reject the contention, urged by the State, that the Secretary no longer plays any role in overseeing the reasonableness of the relationship between costs and reimbursement rates.

The State questions the continuing vitality of our opinion in *Orthopaedic Hospital*, suggesting that subsequent amendments to the Medicaid Act—specifically, the repeal of the Boren Amendment—have rendered it inapplicable. We are not persuaded. As discussed at length in *Orthopaedic Hospital*, in 1981 Congress deleted from § 30(A) the requirement that Medicaid payments not be "in excess of reasonable charges," but left intact the separate mandate that they be "consistent with efficiency, economy, and quality of care." *Orthopaedic Hosp.*, 103 F.3d at 1497; Pub. L. No. 97-35, § 2174, 95 Stat. 357, 809 (1981). As part of the same bill, in a provision dubbed the Boren Amendment, it amended 42 U.S.C. § 1396a(a)(13)(A) ["§ 13(A)"] to require states to

reimburse hospitals at rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." *Orthopaedic Hosp.*, 103 F.3d at 1498 n.2 (quoting Boren Amendment); *see also* S. Rep. No. 97-139, at 431 (1981), *reprinted in* 1981 U.S.C.C.A.N. 396, 697.

As we noted in *Orthopaedic Hospital*, this change was intended to ameliorate states' administrative burdens and to allow them "more flexibility in devising ways to make services available, while at the same time containing costs." 103 F.3d at 1497. Over time, however, it became clear that it had quite the opposite effect. Specifically, the Supreme Court's recognition in *Wilder*, 496 U.S. at 524, that the Boren Amendment was enforceable in a § 1983 action by health care providers against states, led to a great deal of litigation over the reasonableness of state rate setting. *See Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908, 919 n.12 (5th Cir. 2000) (noting problem). In response to this unintended consequence, in 1997 Congress repealed the Boren Amendment, and replaced it with the notice-and-comment rulemaking requirements in place today. Pub. L. No. 105-33, 111 Stat. 251, 507 (1997). In doing so, Congress intended that there be no "cause of action for [providers] relative to the adequacy of the rates they receive." *Evergreen*, 235 F.3d at 919 n.12 (citing H.R. Rep. No. 105-149, at 1230 (1997)).

[7] The State attaches great significance to the repeal of the Boren Amendment, suggesting that Congress thereby intended "to terminate . . . judicial oversight" of reimbursement rates and "to remove any basis for cost-based review of provider reimbursement." While we agree that in repealing the Boren Amendment, as in enacting it, Congress sought to increase states' flexibility in ratesetting, this change did not eviscerate the Secretary's oversight role. During the Boren era, courts recognized that "the Secretary is obliged to ensure that each state complies with the statute by requesting data justifying an individual state's assurances when those assur-

ances are suspect." *Erie County Geriatric Ctr. v. Sullivan*, 952 F.2d 71, 79 (3rd Cir. 1991). Though we recognize that such assurances are no longer part of the regulatory scheme, nothing in the statutory history convinces us that the Secretary's oversight authority has changed, or that more flexibility than was originally intended under the Boren Amendment was intended by its repeal. In any event, its repeal, like its enactment, modified § 13(A) alone; it effected no change to § 30(A). Moreover, the relevant language of § 30(A) remains unchanged since *Orthopaedic Hospital*, and thus our interpretation of its purpose, and the State's obligations thereunder, still holds.[3] *See Orthopaedic Hosp.*, 103 F.3d at 1496-98 (describing these obligations).

### 4. IGTs

We acknowledge, as has the Agency, that the use of IGTs has a statutory basis. *See* 42 U.S.C. § 1396b(w)(6)(A) (providing that, subject to certain exceptions, "the Secretary may not restrict States' use of funds where such funds are derived from State or local taxes . . . transferred from . . . units of government within a State as the non-Federal share of expenditures"); *see also* 66 Fed. Reg. at 3148-49. Thus, there is perhaps some tension, as the State suggests, between the Agency's recognition that IGTs are generally permissible and "fit within the structure of . . . current regulations," *id.* at 3164, and its conclusion that their "excessive and abusive" use is "not consistent with the statutory requirements that Medicaid payments be economical and efficient," *id.* at 3150. This does not, however, change our decision here.

[8] In this case, the Administrator did not disapprove the State's use of IGTs as a financing mechanism; rather, she concluded, based partly on the fact that tribal hospitals would

---

[3]Section § 30(A) was amended in 1989 to include what is known as the "equal access to care" provision. *Orthopaedic Hosp.*, 103 F.3d at 1498. That amendment is not directly relevant to this case.

retain just 10% of the increased federal payments, that the proposed amendment was not consistent with efficiency and economy. *See Louisiana v. United States Dep't of Health & Human Servs.*, 905 F.2d 877, 881 (5th Cir. 1990) (applying a similar analysis to reject Louisiana's contention that the Administrator's ruling was a "veiled attempt" to prohibit the use of average wholesale price as a proxy for the estimated acquisition cost of Medicaid-covered drugs). We note that, following its investigation into financing schemes similar to this one, the General Accounting Office testified before Congress that such uses of IGTs "violate the basic integrity of Medicaid as a joint Federal/State program" and allow states effectively "to replace State Medicaid dollars with Federal Medicaid dollars." 66 Fed. Reg. at 3150. Even assuming that under these circumstances an IGT would fall within the protection of § 1396b(w)(6), the State is not relieved from complying with the numerous other requirements of the Medicaid Act, such as those in § 30(A) that were the basis for disapproval here.

**[9]** In sum, because the Administrator's construction of § 30(A) is consistent with its text, context, and purpose, it merits *Chevron* deference. She did not rely on inappropriate factors or overlook an important aspect of the problem, and her decision was not implausible or counter to the evidence. *See State Farm*, 463 U.S. at 43. Thus, we hold that her disapproval of the State's proposed amendment based on § 30(A) was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

*B.   Section 447.325*

**[10]** The Administrator alternatively ruled that the State failed to set prevailing charges consistent with 42 C.F.R. § 447.325, which provides: "The [state] agency may pay the customary charges of the provider but must not pay more than the prevailing charges in the locality for comparable services under comparable circumstances." Although the proposed

amendment tracks the regulatory language verbatim, it is not the amendment's text but its underlying ratesetting methodology to which the Agency objects. Specifically, the Administrator determined that the State violated § 447.325 because, in calculating prevailing charges, (1) it based its rates for both localities on a single hospital in Anchorage, and (2) its comparison of private facilities to tribal facilities, which historically are funded under a unique scheme, fails to account for "comparable services under comparable circumstances."

We accord substantial deference to an agency's interpretation of its own regulations. *See Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849-50 (9th Cir. 1997). As the Supreme Court has instructed, "Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations and internal quotation marks omitted).

### 1. *"Prevailing Charges" and "Locality"*

In response to the Agency's request for clarification, the State explained that it would identify a tribal facility's "customary charges" from the "charge schedule used by the facility for the regular rates for inpatient services that are charged to both beneficiaries and other paying patients." To determine "prevailing charges," the State would divide Alaska into two localities: urban (Anchorage) and rural (everywhere else). Then, for each locality, it would identify all hospitals offering "a comparable array of services under comparable circumstances" to the tribal facilities. Using only those facilities, it would divide the total charges by the total inpatient days to arrive at the prevailing rate.

Testimony at the evidentiary hearing indicated, however, that the State used charges from a single private hospital in

Anchorage to determine the prevailing charges for all tribal facilities in both localities. The hearing officer issued her recommended decision on this understanding, which the State, in its exceptions to the hearing officer's recommendations, in fact reinforced. Admin. R. at 17 ("The State has provided evidence that due to the unique nature of health care services in Alaska, there is only one hospital that provides services that are comparable to those provided in the relevant tribal health centers.").

Although the State now suggests that this finding is factually incorrect, it is nowhere contradicted in the record, and we conclude that it is supported by substantial evidence. *See Bear Lake*, 324 F.3d at 1076-77 & n.8 (explaining standard). Thus, to the extent that the State calculated prevailing charges for the rural locality based only on charge information from a hospital in Anchorage, its methodology is inconsistent with § 447.325, which plainly requires that the State "must not pay more than the prevailing charges *in the locality*" (emphasis added).

### 2. *"Prevailing Charges" and "Comparable Circumstances"*

The Agency additionally objects to the State's use of rates from a private hospital to determine the prevailing charges at tribal facilities, which currently are tied to IHS published rates. The State argues that tribal facilities are not bound to charge, nor must the State limit payment to, the IHS rates. Moreover, noting that neither "customary charges" nor "prevailing charges" is defined within the Medicaid Act or its implementing regulations, but that both are defined in Medicare regulations, it argues that its methodology for determining these charges is fully consistent with the Medicare regulations. The Agency concedes that the IHS rates are not mandatory, but argues that, in this context, "comparable circumstances" must mean other facilities that are federally funded and receive 100% FMAP reimbursement. It stresses

that tribal facilities operate under markedly different circumstances than private hospitals—namely, they are largely funded by the federal government, and their Medicaid expenses are reimbursed fully by the federal government.

On this point, the Administrator's construction is focused not on the "locality" requirement, but rather on the distinct requirement that, within each locality, prevailing charges must be tuned to "comparable circumstances." This distinction is fully supported by the regulatory text. Thus, we decline to decide whether it is the Agency's or the State's interpretation that best serves the regulatory purpose; rather, under the limited scope of our appellate review, we must give the Agency's interpretation "controlling weight." *See Thomas Jefferson Univ.*, 512 U.S. at 512; *Anaheim Mem'l Hosp.*, 130 F.3d at 849-50.

**[11]** Thus, we conclude that the State's methodology for determining prevailing charges is inconsistent with the applicable UPL, and hold that the Administrator's disapproval of the proposed amendment based on 42 C.F.R. § 447.325 was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

## CONCLUSION

For the foregoing reasons, the petition for review of the Administrator's disapproval of Alaska's state plan amendment 01-009 is **DENIED**.