State of NORTH DAKOTA, ex rel. Carol K. OLSON, Executive Director, North Dakota Department of Human Services, Plaintiff,

v.

CENTERS FOR MEDICARE AND MEDICAID SERVICES, Thomas A. Scully, in his official Capacity as Administrator of the Centers for Medicare and Medicaid Services, U.S. Department of Health and Human Services, and Tommy G. Thompson, in his official capacity as Secretary of the U.S. Department of Health and Human Services, Defendants.

No. A1–03–28.

United States District Court,
D. North Dakota,
Southwestern Division.

Oct. 1, 2003.

Jean R. Mullen, Attorney General's Office, Civil Litigation, Bismarck, ND, for plaintiff.

David L. Peterson, U.S. Attorney's Office, Bismarck, ND, Sheila M. Lieber, Serrin Turner, U.S. Department of Justice, Washington, DC, for defendants.

## MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HOVLAND, Chief Judge.

The Plaintiff, State of North Dakota, seeks judicial review of a final agency decision of the United States Department of Health and Human Services Departmental Appeals Board. That decision affirmed an earlier determination that North Dakota could not be fully reimbursed for services provided to Native Americans living on or near an Indian reservation, who are referred by an Indian Health Service provider to a non-IHS provider who is under contract with IHS to accept referrals and provide medical services to Native Americans, when such services are not provided at IHS facilities. Before the Court are cross motions for summary judgment which will resolve the matter in its entirety. For the reasons set forth below, the Plaintiff's Motion for Summary Judgment

is granted and the Defendants' Motion for Summary Judgment is denied.

## I. BACKGROUND

### A. STATUTORY AND REGULATORY BACKGROUND

#### 1) MEDICAID AND THE FEDERAL MEDICAL ASSISTANCE PERCENTAGE.

Title XIX of the Social Security Act, commonly referred to as Medicaid, authorizes the Centers for Medicare and Medicaid Services (CMS) to make federal funds available to the states in order to help them carry out their traditional responsibility to provide medical services to the poor. 42 U.S.C. §§ 1396–1396v (2001). CMS is the successor to the Health Care Financing Administration (HCFA). State participation in Medicaid is optional. However, states electing to participate must submit a plan for providing services under which they agree to abide by the applicable requirements of the Medicaid statute and regulation. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Native American residents are eligible for Medicaid benefits on the same basis as any other state citizen.

The Medicaid program is funded and administered jointly by the federal and state governments. In North Dakota, the state agency designated to administer the Medicaid program is the North Dakota Department of Human Services. Under Medicaid, the federal government pays a percentage of the "total amount expended ... as medical assistance under [a] State plan." 42 U.S.C. § 1396b(a)(1). This portion of a state's expenditure is reimbursed by the federal government and is referred to as the Federal Medical Assistance Percentage (FMAP). Each state's FMAP is determined by a statutory formula that establishes a reimbursement rate of between 50% and 83% and gives higher reimbursement rates to states with lower per-capita incomes. 42 U.S.C. § 1396d(b)(1). The normal FMAP rate currently in effect for North Dakota is 68.36%. See Federal Financial Participation in State Assistance Expenditures, 66 Fed.Reg. 59, 790, 59790–02 (Nov. 30, 2001). This federal assistance, although termed "reimbursement", is actually provided to the states through prospective federal grants that are subsequently reconciled with actual state expenditures. 42 U.S.C. §§ 1396(a)-(b), (d). The grants consist of quarterly advances of the federal share of the state's estimated Medicaid expenditures, in amounts "reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made ... to such state for any prior quarter." *Id.*

#### 2) THE SPECIAL 100% FMAP RATE FOR SERVICES PROVIDED THROUGH AN INDIAN HEALTH SERVICE FACILITY.

Indian Health Service (IHS) is an agency within the Department of Health and Human Services that provides primary health care services for Native Americans throughout the United States. Prior to the enactment of the Indian Health Care Improvement Act (IHCIA) in 1976, Pub.L. No. 94–437, IHS facilities were not authorized to receive payments from state Medicaid programs. Without this funding source, IHS facilities did not offer many Medicaid-supported services. As a result, many Native Americans served by IHS facilities lacked access to Medicaid services despite being Medicaid-eligible.

In the IHCIA, Congress enacted a broad-reaching set of reforms intended to raise the standards of health care provided to Native Americans to a level equal to that enjoyed by other American citizens. Among other things, Congress sought to ensure that Native Americans served by

IHS facilities had access to Medicaid services. The IHCIA enabled IHS facilities to submit claims for payment from state Medicaid programs for services provided to Medicaid-eligible patients. These payments were intended to supplement direct federal appropriations to IHS so as to effect a net improvement in IHS services. However, Congress did not intend to transfer to the states any portion of costs which normally would have been borne by the Indian Health Service. Therefore, IHCIA added a provision to Section 1905(b) of the Social Security Act which provided for a special 100% FMAP reimbursement rate for state Medicaid payments for services provided to Native Americans "through an Indian Health Service facility." 42 U.S.C. § 1396(d)(b).

### 3) THE IHS CONTRACT CARE PROGRAM.

In addition to providing care in IHS facilities, IHS also operates a "contract care" program designed to help Native Americans obtain health care services from non-IHS providers when needed services are not provided by IHS facilities themselves. See 42 C.F.R. pt. 136, subpt. C (2003). Under the program, IHS acts as a residual payor for services provided to Native Americans by non-IHS facilities. See 42 C.F.R. § 136.61. As part of the program, IHS contracts with non-IHS providers to accept referrals from IHS facilities and to provide services at reduced rates. The state Medicaid payments at issue in this case were made to non-IHS facilities participating in the contract care program for services provided to Native Americans referred from IHS.

The special 100% FMAP reimbursement provision was included in the Indian Health Care Improvement Act so that state Medicaid programs would not be burdened by costs which normally would have been incurred by IHS. This was accomplished by amending Section 1905(b) of the Social Security Act. This statutory provision, which forms the basis of the dispute between the parties, provides as follows:

> The Federal medical assistance percentage shall be 100 per centum with respect to amounts expended as medical assistance for services which are received through an Indian Health Service facility whether operated by the Indian Health Service or by an Indian tribe or tribal organization. . . .

42 U.S.C. § 1396d(b) (emphasis added).

From 1976 to 1996, the Centers for Medicare and Medicaid Services (CMS) interpreted this statute to mean that only Medicaid payments made to IHS-owned facilities could be reimbursed at the 100% FMAP rate. This interpretation excluded facilities owned and operated by Indian tribes and under contract with CMS. However, Congress rejected this interpretation in 1994 when it passed the Indian Self–Determination and Education Assistance Act which required that tribal health facilities leased from IHS be treated as IHS facilities. See 25 U.S.C. § 450(j)(1). IHS was also required to lease facilities on request.

In response, CMS and IHS issued a Memorandum of Agreement in December 1996 that avoided the necessity of leases by making the 100% FMAP available to all facilities that would have been eligible had the required lease been entered into. This new policy went into effect on July 11, 1996. The new policy expanded the 100% FMAP to cover expenses incurred for services provided by or through IHS-operated facilities and tribal health care facilities owned and operated by tribes and tribal organizations with funding authorized by Title I or III of the Indian Self–Determination and Education Assistance Act (Public Law 93–638), commonly referred to as "638".

In 1997, North Dakota concluded that CMS had determined that the phrase "for services which are received through an Indian Health Service facility" included services from non-IHS contract care providers when referred by an IHS provider. This conclusion was primarily based on a 1997 CMS Memorandum and the aforementioned 1996 Memorandum of Agreement. North Dakota also points to several discussions it had with CMS employees in 1997 and 1999 in which North Dakota claims that the 100% FMAP reimbursement for referred services was acknowledged as a correct interpretation of the law and the mutual understanding of the parties.

The 1997 CMS Memorandum addressed an inquiry from the State of Arizona concerning whether non-emergency transportation provided to American Indians was eligible for 100% FMAP. On January 3, 1997, CMS sent a memorandum to state Medicaid directors and the CMS Memorandum stated in relevant part as follows:

> [N]on-emergency medical transportation is not considered to be an IHS (638) facility service and, therefore, does not qualify for reimbursement of 100% FMAP ... Our position on this issue is that in order for IHS services to qualify for 100% FMAP, the service must be: (1) provided by IHS, or a contractual agent of an IHS or tribal facility, (2) considered as a "facility service"; that is, a service that would be within the proper scope of services which can be claimed by that facility, and (3) claimed by the IHS facility as a service of that facility. These services are referred to in regulation at 42 CFR 440.10 ("Inpatient hospital services") and 42 CFR 440.20 ("Outpatient hospital services and rural health facility services").

> For most facilities, services are furnished within the physical confines of the facility. Satellite facilities owned or leased, and operated by IHS or tribal 638 programs, are also considered to be within the physical confines of an IHS/tribal facility. Referred services, provided through contractual arrangement, can also be considered provided "through an IHS facility" and reimbursed at the 100% FMAP rate as long as these are services that could be provided as a "facility service", as referenced by regulation above. Any other type of services, such as non-emergency transportation, are not considered to be "facility services", and, therefore, should be reimbursed at the normal State/Federal match rate.

(Emphasis supplied).

The State of North Dakota interpreted the 1997 CMS Memorandum to mean that the state could claim 100% FMAP for services provided to Medicaid-eligible Native Americans who had selected IHS as their primary care provider and who, when seeking health care services from the IHS provider, had been referred to a non-IHS provider that had a contract with CMS.[1] The contracts the non-IHS health care providers had with CMS were under the "contract care" program.

In October 1998, North Dakota began submitting these claims for payment dating back to July 11, 1996. North Dakota ceased making such claims in September 2000 after learning that CMS was considering disallowing similar claims made by Arizona.

On or about June 27, 2001, North Dakota received a letter from CMS disallowing these claims. CMS took the position that the claimed services were referred and

---

1. South Dakota interpreted the 1997 Memorandum in the same fashion and is involved in a similar lawsuit. *Ellenbecker, et al. v. Centers* *for Medicare, et al.*, No. 02–3042 (D.S.D. Filed Dec. 16, 2002).

thus the services were not received "through an Indian Health Service facility". The disallowance was in the amount of $350,020. On July 17, 2001, North Dakota appealed the disallowance to the Departmental Appeals Board of the United States Department of Health and Human Services. A decision affirming the disallowance was issued on October 30, 2002. The DAB held that Section 1905(b) of the Social Security Act's reference to services "received through" an IHS facility is ambiguous. DAB further held that the Secretary's interpretation of the statute denying 100% FMAP was reasonable and that North Dakota had been put on notice of such an interpretation. This appeal seeking declaratory and injunctive relief was filed on March 5, 2003.

## II. STANDARD OF REVIEW

A review of this matter is governed by the Administrative Procedures Act. (APA) 5 U.S.C. § 706(2). A court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(E)(A). The arbitrary and capricious standard requires judicial affirmance if the agency provides a rational basis for its action. *Mausolf v. Babbitt*, 125 F.3d 661, 667 (8th Cir.1997). It is well-established that the plain meaning of a statute controls regardless of an agency's determination. *Hennepin County Med. Ctr. v. Shalala*, 81 F.3d 743, 748 (8th Cir.1996).

When courts review an agency's construction of an ambiguous statute, considerable weight should be accorded the agency construction, if that construction is reasonable and permissible. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, Chevron deference is due only where the interpretation has been arrived at through formal adjudication or notice-and-comment rulemaking. *Christensen v. Harris County*,

529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Opinion letters, policy statements, agency manuals and enforcement guidelines do not warrant Chevron deference. These types of interpretations are only entitled to respect insofar as they have the power to persuade.

The basic rule of statutory construction is that when a statute is clear, certain and unambiguous on its face there is no reason for construction and none should take place. *Northwest Paper Co. v. Federal Power Comm'n*, 344 F.2d 47, 50 (8th Cir. 1965). Where the terms of a statute are clear and straightforward, judicial inquiry is complete and the legislative history need not be considered. *United States v. Vig*, 167 F.3d 443, 448 (8th Cir.1999). Only under exceptional circumstances should a court go beyond asking what a statute means and enquire into what Congress meant. *Id.*

## III. LEGAL DISCUSSION

This case presents an issue of statutory construction. The parties concede that the material facts are not in dispute. The issue presented is whether the phrase "services which are received through an Indian Health Service facility" covers the referred services claimed by North Dakota. Specifically, are services received through an Indian Health Service facility, when a Native American living on or near an Indian reservation is referred by an IHS provider to a non-IHS provider who is under contract with IHS pursuant to the "contract care" program, covered services? The parties differ as to the meaning of the phrase "services which are received through an Indian Health Service facility." As previously noted, North Dakota was of the understanding that the statutory language at issue included services received from non-IHS contract care providers

when the Medicaid-eligible patient had been referred by an IHS provider.

Prior to the disallowance of North Dakota's claims and the adjudicatory opinion by the Departmental Appeals Board, CMS had never issued a formal written policy or interpretation of the statutory provision at issue, i.e., 42 U.S.C. § 1396(d)(b). In fact, CMS had for several years never objected to the allowance of 100% FMAP reimbursement for services provided to Native Americans by non-IHS medical contract care providers following referrals made by IHS. However, in June 2001, CMS interpreted the phrase "services which are received through an Indian Health Service facility" to mean the services had to be received at an IHS facility. Although CMS attempts to redefine the issue, the disallowance letter sent to North Dakota in June 2001 gives the reason for disallowance as being that the services "were not furnished by or at Indian Health Services (IHS) or 638 facilities." North Dakota had consistently taken the position that the statute meant that as long as the Native American patient first sought medical services at an IHS facility and was then subsequently referred to a facility participating in the contract care program, the services were received "through an Indian Health Service facility" and thus, eligible for full reimbursement. The Court agrees.

The Native Americans in North Dakota who sought medical care and services first presented themselves to IHS as their primary provider and the IHS provider subsequently referred them to a non-IHS facility for health care services and treatment. By presenting themselves to an IHS facility the Native Americans were seeking services "through an Indian Health Service facility." It should not matter that the Native Americans seeking medical care and services were referred to a non-IHS provider participating in the contract care program for the medical care they so desperately needed. By disallowing such claims, CMS effectively requires the medical care to be provided at an IHS facility when the statute [42 U.S.C. § 1396(d)(b)] clearly states the services shall be reimbursed at 100% FMAP if such services are "received through an Indian Health Service facility."

In enacting Section 1905(b) of the Social Security Act [42 U.S.C. § 1396(d)(b)], Congress used the word "through" when it could have used the word "at". The term is not ambiguous. It is not a reasonable interpretation of the statute for CMS to read the word "through" out of the statute and replace it with the word "at". The clear intent of Congress when it enacted Section 1905(b) was for the federal government to continue its historic responsibility to provide adequate health care services to Native Americans. The intent was obviously to provide essential health care services to Native Americans and in many parts of the country that can only be done through referrals. As a result, IHS has entered into contractual arrangements with non-IHS providers to accomplish the federal mandate. CMS does not offer any reasonable interpretation of Section 1905(b) which would give any meaning to the word "through."

The Court concludes as a matter of law that Section 1905(b) of the Social Security Act, [codified at 42 U.S.C. § 1396(d)(b)] is not ambiguous. The statutory language is clear and unambiguous and in this case allows for the 100% FMAP reimbursement rate with respect to amounts expended as medical assistance for "services which are received through an Indian Health Service facility" whether directly operated by IHS or when the Native American is referred by an IHS provider to a non-IHS contract care provider. The language of the statute is clear. It is equally clear that Con-

gress would have intended such a result to benefit those Medicaid-eligible Native Americans who first present themselves to an IHS facility and are then referred to a non-IHS facility or provider based on a pre-existing contractual arrangement. To hold otherwise would effectively defeat the purpose of the statute.

The services provided were billed to the North Dakota Medicaid program as required by the alternate resource rule. 42 C.F.R. § 136.61. This rule, which was promulgated by IHS, makes IHS the payor of last resort. The rule says nothing as to the proper FMAP reimbursement for the state medicaid payment. Nor does the rule provide that IHS will never have any responsibility for payment. The alternate resource rule cannot be relied upon by CMS for the proposition that the medical services were not provided "through an [IHS] facility".

The Court believes that CMS cannot shirk its responsibility every time a Medicaid-eligible Native American patient leaves an IHS facility. The HMO Act of 1973 authorized the IHS to contract with non-IHS facilities for services IHS did not provide. 42 U.S.C. § 2001(b). The HMO Act predated the availability of Medicaid made allowable by the Indian Healthcare Improvement Act in 1976. Thus, responsibility for referred health care services is one traditionally borne by the federal government which Congress sought to keep a federal responsibility by enacting Section 1905(b) of the Social Security Act.

The CMS interpretation is also in direct conflict with Congress' stated purpose in enacting Section 1905(b) to avoid shifting the cost of IHS facilities, which have always been an exclusively federal responsibility, to the states. CMS has acknowledged that Congress did not intend to transfer to the states any portion of the costs which IHS normally would bear. See Memorandum in Support of Defen-

dants' Motion to Dismiss or for Summary Judgment, p. 4. The provision of health care to Native Americans is primarily the responsibility of the federal government. *McNabb v. Bowen*, 829 F.2d 787, 792 (9th Cir.1987). State responsibility is secondary. The CMS interpretation gives the state primary responsibility for referred services.

Congress has previously disapproved of the narrow construction of statutes designed to address the provision of health care services to Native Americans living on or near reservations. This was done in passing the 1994 amendments to the Indian Self–Determination Act of 1975. 25 U.S.C. § 450 et seq. This Act allows tribes to assume responsibility for health care services otherwise provided by IHS. 25 U.S.C. § 450f. The 1994 amendments legislatively overruled the narrow construction of the statute by CMS that a facility had to be owned or leased by IHS in order to be eligible for 100% FMAP. This interpretation effectively excluded tribally owned facilities. The overruling was accomplished by a mandatory lease provision by which a tribe could request that IHS lease the tribe's health facilities and IHS would be required to do so. 25 U.S.C. § 450j(*l*). This provision brought the facilities within the scope of Section 1905(b) and thereby made them eligible for the 100% FMAP reimbursement rate. The current CMS interpretation of "services which are received through an Indian Health Service facility" is arbitrary, capricious, and erroneous and only serves to frustrate the federal government's historic responsibility to American Indians.

In sum, the Court concludes as a matter of law that when a Native American who lives on or near a reservation presents himself or herself to an Indian Health Service facility, and then is subsequently referred for needed health care services to a non-IHS provider participating in the

contract care program, those services are provided "through an Indian Health Service facility" as established by Section 1905(b)of the Social Security Act. The terms of the statute are clear and unambiguous.

IV. CONCLUSION

For the reasons set forth above, the Court finds that the Defendants interpretation of Section 1905(b) of the Social Security Act to be arbitrary, capricious and contrary to the plain meaning of the law. Accordingly, the Plaintiff's Motion for Summary Judgment (Docket No. 8) is GRANTED and the Defendant's Motion for Summary Judgment (Docket No. 4) is DENIED. The Defendants are enjoined from implementing the policy announced in the CMS disallowance letter dated June 27, 2001 and DAB Decision No. 1854 dated October 30, 2002. The Defendants shall return all monies collected from the State of North Dakota pursuant to this policy for claims dating back to July 11, 1996.

IT IS SO ORDERED.